J. S69025/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
:         PENNSYLVANIA
:
:
:
       v.                                 :
:
SIDNEY LAMONT WATERS        :
:
         APPELLANT        :     No. 152 MDA 2016

Appeal from the Judgment of Sentence December 23, 2015
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s): CP-36-CR-0001250-2015

BEFORE: STABILE, J., DUBOW, J., and PLATT, J.[*]

MEMORANDUM BY DUBOW, J.:               **FILED OCTOBER 19, 2016**

Appellant, Sidney Lamont Waters, appeals from the December 23, 2015 Judgment of Sentence of two concurrent terms of two to five years' incarceration imposed after the court found him guilty of one count each of Firearms not to be Carried without a License and Possession of a Firearm with Altered Manufacturer's Number.[1,2] Appellant alleges specifically that the trial court erred when it denied his pre-trial suppression motion. After careful review, we affirm.

---

[*] Retired Senior Judge Assigned to the Superior Court.

[1] 18 Pa.C.S. § 6106 and 18 Pa.C.S. § 6110.2, respectively.

[2] The Commonwealth also charged Appellant with Possession of Marijuana, 35 Pa.C.S. § 780-113(a)(3), but did not present any evidence at trial in support of this charge. Accordingly, the trial court found Appellant not guilty of Possession of Marijuana.

The trial court's Pa.R.A.P. 1925(a) Opinion includes a thorough and complete narrative of the facts and procedural history in this case, which we adopt for purposes of our disposition. **See** Trial Ct. Op., 3/7/16, at 1-3, 5-9.

Appellant presents the following issue for our review:

> Did the trial court err in denying [Appellant's] motion to suppress, where police did not have a reasonable suspicion to stop and frisk [Appellant] initially, and therefore, any observations of the police after that or any evidence taken from [Appellant] should have been suppressed as the fruit of the illegal stop and frisk?

Appellant's Brief at 4.

Our standard of review in an appeal from an order denying a Motion to Suppress is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

**Commonwealth v. Jones**, 988 A.2d 649, 654 (Pa. 2010) (citation omitted).

A police officer may conduct an investigative detention, otherwise known as a **Terry**[3] stop, of an individual if he or she has reasonable

---

[3] **Terry v. Ohio**, 392 U.S. 1, 24 (1968).

suspicion that criminal activity is afoot. *Commonwealth v. Bryant*, 866 A.2d 1143, 1146 (Pa. Super. 2005). That suspicion must be based on "specific, articulable facts" known to the officer at the time and "reasonable inferences drawn from those facts in light of the officer's experience." *Commonwealth v. Jackson*, 698 A.2d 571, 573 (Pa. 1997).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned Opinion of the trial court we conclude that the issue Appellant has raised on appeal lacks merit. The trial court Opinion properly disposes of the question presented. *See* Trial Ct. Op. at 3-5, 9-12 (concluding: (1) the officer reasonably suspected, based upon specific and articulable facts and the reasonable inferences drawn from those facts and their experience, that the three men he observed running in the street shortly before a dispatch for shots fired, and who were subsequently stopped by police were the same men involved in the shooting; (2) based on the temporal and spatial proximity to the area where shots were reportedly fired, the officer had reasonable suspicion to suspect that Appellant was armed; and (3) the search performed was limited to what was necessary to ensure officer safety, and the firearm was readily apparent). Accordingly, we affirm on the basis of the trial court's Opinion.

The parties are instructed to attach a copy of the trial court's March 17, 2016 Opinion to all future filings.

Judgment of Sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/2016

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA**
**CRIMINAL**

|                                     |   |                       |
|-------------------------------------|---|-----------------------|
| COMMONWEALTH OF PENNSYLVANIA        | : |                       |
|                                     | : | 152 MDA 2016          |
| vs.                                 | : |                       |
|                                     | : | CP-36-CR-0001250-2015 |
| SIDNEY LAMONT WATERS                | : |                       |

**PA R.A.P. 1925 OPINION**

BY TOTARO, J.

On March 5, 2015, shortly after 9:50 p.m., officers of the Lancaster City Bureau of Police stopped Sidney Lamont Waters ("Appellant") and two other men in the vicinity of 644 Columbia Avenue, Lancaster, Pennsylvania, after Lancaster County dispatch reported a call of shots fired and gave a description of three males wearing dark hoodies seen in the area. *See* Affidavit of Probable Cause. According to the Affidavit, Appellant and two other men were found matching the description. *Id.* Because they believed the men could be armed, officers performed a pat-down search of all three individuals, at which time Appellant was found to be carrying a firearm with obliterated manufacturers number and suspected marijuana. *Id.* Appellant was taken into custody and charged with Firearms Not To be Carried without a License (F3), Possession of a Firearm with Altered Manufacturer's Number (F2), and Possession of Marijuana (M).[1] *Id.*

On July 8, 2015, Appellant filed a Motion to Suppress Evidence, alleging the officers did not have a proper warrant, probable cause or reasonable suspicion to effectuate the stop, search, and seizure of Appellant. *See* Omnibus Pretrial Motion. As such, Appellant claimed the search and seizure of a firearm violated his rights as guaranteed by the 4th and 14th Amendments of the United States Constitution, as well as Article 1, Section 8 of the Pennsylvania Constitution. *Id.*

---

[1] 18 Pa.C.S.A. § 6106; 18 Pa.C.S.A. § 6110.2; and 35 P.S. § 780-113(a)(31), respectively.

On September 28, 2015, a suppression hearing was held on Appellant's Motion to Suppress Evidence. At the conclusion of the suppression hearing, the Court found, based on specific and articulable facts, that there was reasonable suspicion for police to conduct a temporary stop of Appellant in relation to the dispatch of shots fired. (Notes of Transcript at 93-94) (hereinafter "N.T."). Moreover, police had reasonable suspicion to believe Appellant was potentially armed and dangerous, justifying a protective search of Appellant limited in nature to that which was necessary to discover any weapons. *Id.* Further, the nature of the object as a firearm was immediately apparent. *Id.* at 94. Therefore, Appellant's motion was denied. *Id.*

Following the suppression hearing, the parties proceeded to a stipulated bench trial. (N.T. at 100). At that time, both counsel agreed to incorporate the entire record from the suppression hearing. *Id.* Counsel also entered into a number of stipulations which established factual guilt on the firearms charges, and thus the Court found Appellant guilty on those counts.[2] *Id.* at 100-104, 106. However, because no evidence was presented with respect to the charge of possession of marijuana, the Court found Appellant not guilty of that count. *Id.* at 104-06. A Presentence Investigation Report was ordered, and sentence was deferred pending its completion.[3] *Id.* at 106.

---

[2] Counsel stipulated that the firearm found on Appellant was a functional firearm capable of expelling a projectile under the action of an explosive; Appellant did not have a license to carry a concealed weapon on the date of the offense and because he was only 19 years old on that date he was not eligible for such a license; Appellant gave a voluntary statement to police detectives following his arrest admitting to possessing the firearm; the manufacture's number on the firearm had been obliterated; and Officer Sinnott charged Appellant with the three aforementioned counts. (N.T. at 100-04).

[3] On December 23, 2015, the trial court imposed a standard range sentence of not less than two years nor more than five years in the State Correctional Institution on each count, concurrent to each other. (Notes of Transcript, Sentencing at 25) (hereinafter "N.T.S."); Sentencing Guideline Worksheet. Appellant was ordered to pay a fine of $100, submit a DNA sample and pay the $250 cost, he was not made eligible for the Recidivism Risk Reduction Incentive (RRRI) Program, and he received credit for time served. (N.T.S. at 25-26). Appellant was also made eligible for boot camp, any programs dealing with drug and alcohol addiction, as well as any vocational or educational programs. *Id.* at 26.

On January 22, 2016, Appellant filed a Notice of Appeal with the Superior Court of Pennsylvania. On February 16, 2016, Appellant timely filed a Statement of Errors Complained of on Appeal ("Statement"), claiming the suppression court erred in denying his Motion to Suppress Evidence because police did not have reasonable suspicion to stop and frisk Appellant. *See* Statement. As such, any evidence taken from Appellant should have been suppressed "as the fruit of the illegal stop and frisk." *Id.*

## LEGAL STANDARD

When a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. *Commonwealth v. Bowmaster*, 101 A.3d 789, 792 (Pa. Super. 2014). When the Commonwealth prevails on a motion to suppress evidence before the trial court, an appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *Commonwealth v. Jackson*, 62 A.3d 433, 438 (Pa. Super. 2012).

Where the record supports the factual findings of the trial court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Angel*, 946 A.2d 115, 117 (Pa. Super. 2008) (quoting *Commonwealth v. Russo*, 934 A.2d 1199, 1203 (Pa. 2007)). While the appellate court is not bound by the lower court's conclusions of law, "it is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Angel*, 946 A.2d at 117 (quoting *Russo*, 934 A.2d at 1203); *Commonwealth v. Dutrieville*, 932 A.2d 240, 242 (Pa. Super. 2007); *Commonwealth v. Martin*, 101 A.3d 706, 719 (Pa. 2014).

3

A police officer may conduct an investigative detention of an individual if he has reasonable suspicion that criminal activity is afoot. *Commonwealth v. Bryant*, 866 A.2d 1143, 1147 (Pa. Super. 2005) (citing *Commonwealth v. Zhahir*, 751 A.2d 1153, 1156 (Pa. 2000)). That suspicion must be based on specific, articulable facts known to the officer at the time and reasonable inferences drawn from those facts in light of the officer's experience. *Commonwealth v. Jackson*, 698 A.2d 571, 573 (Pa. 1997) (citing *Terry v. Ohio*, 392 U.S. 1, 24 (1968)). "The fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate." *Zhahir*, 751 A.2d at 1156 (quoting *Terry*, 392 U.S. at 21-22) (internal quotation marks omitted).

"A police officer need not personally observe the suspicious conduct leading to the reasonable belief needed for a *Terry* stop and may rely upon information received over the police radio to justify the initial stop." *Commonwealth v. Arch*, 654 A.2d 1141, 1144 (Pa. Super. 1995). An officer may also rely on information provided by third parties under certain circumstances. *Commonwealth v. Korenkiewicz*, 743 A.2d at 958, 963 (Pa. Super. 1999).

Whether an officer has reasonable suspicion to stop an individual requires an evaluation of the totality of the circumstances, viewed though the eyes of a trained officer rather than an ordinary citizen. *Zhahir*, 751 A.2d at 1156; *In re N.L.*, 739 A.2d 564, 567 (Pa. Super. 1999). Factors to consider include "the specificity of the description of the suspect in conjunction with how well the suspect fits the given description, the proximity of the crime to the sighting of the suspect, the time and place of the confrontation, and the nature of the offense reported to have been committed." *Commonwealth v. Jackson*, 678 A.2d 798, 801 (Pa. Super. 1996).

4

Once an officer has lawfully detained an individual, the "officer may conduct a limited, pat-down search for weapons when the officer has reasonable suspicion that the individual is armed and dangerous." *Jackson*, 698 A.2d at 573. Because the justification of this search is for the protection of the officer or others nearby, "such a protective search must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Commonwealth v. Stevenson*, 744 A.2d 1261, 1264-65 (Pa. 2000) (quoting *Terry*, 392 U.S. at 26). The nature of the suspected criminal activity is a proper consideration in the totality of the circumstances in determining whether a search was appropriate. *Zhahir*, 751 A.2d at 1157. It is appropriate for an officer to search an individual when the individual is stopped for the investigation of gunshots in the nearby area. *Bryant*, 866 A.2d at 1147.

## DISCUSSION

On March 5, 2015, at approximately 9:51 p.m., Officer Ben Bradley ("Bradley") of the Lancaster City Police Department ("LCPD") was patrolling in the area of East Filbert Street approaching Lafayette Street when he observed three men running together north on East Filbert Street. (N.T. at 6, 8-11). Fresh snow was on the ground and the temperature was 18 degrees. *Id.* at 9. Although it was dark, there were street lights in the area and he could tell they were males. *Id.* at 18-19. Because hardly anyone was out that night and the ground was icy, Bradley took mental note of the three males. *Id.* at 22. Bradley observed the men were around five foot five inches tall, wearing dark clothing that included jackets or hooded sweatshirts. *Id.* at 10, 17, 18.

Shortly thereafter, Bradley saw a fourth man look up the street in the direction where the first three males had just traveled. (N.T. at 12). When Bradley saw the fourth man throw a cardboard pizza box on the ground, Bradley stopped the man for littering. *Id.* at 12, 20, 22.

5

Approximately 15 seconds after stopping the fourth man, Lancaster County dispatch reported a call of shots fired at 25 New Dorwart Street, and gave the description of three individuals who were wearing hoodies. *Id.* at 12-13. According to Bradley, 25 New Dorwart is at the corner of Lafayette Street, and the dispatch for shots fired occurred approximately "a minute or less" after Bradley saw the three individuals running. *Id.* at 11-13. At that point, Bradley dispatched information about his observation of the three men he just saw running down the street. *Id.* at 13.

After clearing the fourth man, Bradley joined the search and was called to assist officers who had stopped three men. (N.T. at 13). Upon arrival, Bradley stated the three males who were stopped looked like the same three individuals he saw running around the corner on Filbert Street, based on their clothing, similar height and build. *Id.* at 13-14, 23. Furthermore, only a few minutes had passed between the time he observed the three men running and the time the three individuals were stopped. *Id.* at 14. Because of the weather, pedestrian traffic was "pretty low that night," and from the time he saw the three individuals until he responded to where they had been detained Bradley did not see any other groups of individuals matching the description that was given out over the radio. *Id.* at 14-15.

Bradley testified he has been employed as a police officer with LCPD since October 2007. (N.T. at 6). He further testified that the area where he saw three men running and where the three men were later stopped is within his jurisdiction. *Id.* at 7. Bradley stated he is familiar with the area and officers are frequently dispatched there for criminal activity such as robberies, aggravated assaults, and weapons calls. *Id.* at 8. More specifically, during his career he has seen "at least two homicides, three shootings and countless shots fired calls" in the area. *Id.*

6

Officer Michael Fisher ("Fisher") of the LCPD was on duty on March 5, 2015, riding in a patrol vehicle with Officer Bogner ("Bogner"). (N.T. at 25-28). At approximately 9:50 p.m., Fisher and Bogner were dispatched to respond to a call of shots fired in the first block of New Dorwart Street. *Id.* at 27-29. The dispatch gave an address and a description of three men in hooded sweatshirts. *Id.* at 29. Thereafter, Fisher and Bogner heard Bradley's radio transmission describing his observation of three men wearing darker clothing with hooded sweatshirts on Filbert Street. *Id.* at 29-30. The officers then heard Sergeant McCrady ("McCrady") call out on the radio that he located three men in hooded sweatshirts at 644 Columbia Avenue in Lancaster City. *Id.* at 31. Fisher and Bogner responded to McCrady's location within seconds, and when they arrived Fisher saw three men wearing hoodies. *Id.* at 31-34. At no time did Fisher recall seeing any other people, "let alone anybody in groups." *Id.* at 33-34.

As officers approached the three men, Fisher asked them to "hold up" so officers could talk to them. (N.T. at 34). The men complied. *Id.* at 35. Within a period of less than four minutes, when a sufficient number of officers arrived at the scene, a pat-down search was conducted of the three men. *Id.* at 35-37. According to Fisher, the search was appropriate "because of the call that was received and because of the investigation into the shots fired . . . ." *Id.* at 35. Fisher also testified the area where the shots were fired is a high crime area, based on continual problems such as fights, shootings, and weapons calls. *Id.* at 27, 42.

Officer Timothy Sinnott ("Sinnott") of the LCPD testified he was working on the evening of March 5, 2015, when he heard county dispatchers relay information about a shooting that was reported by Maria Montes. (N.T. at 45-46, 61-62). Thereafter, Sinnott responded to the scene where three men were being held, arriving within three to five minutes after the call came out for

7

shots fired. *Id.* at 45-50. Prior to arriving at that location, while driving around looking for the suspects, Sinnott did not see anyone else out that evening. *Id.* at 48. According to Sinnott, the distance from where the shots were reportedly fired to where Appellant and the other two men were stopped was within two to three blocks of each other. *Id.* at 65-66.

Upon arrival, Sinnott approached Appellant. (N.T. at 49). While Fisher and Bogner conducted pat-down searches of their respective suspects, Sinnott conducted a pat-down search of Appellant. *Id.* at 51. According to Sinnott, he did so due to the nature of the call that had been given out and for officer safety. *Id.* at 52.

Sinnott conducted the pat-down by "running over the outside of [Appellant's] clothing, feeling for anything that [he could] recognize." (N.T. at 52-53). While placing his hand over Appellant's right pant leg, Sinnott immediately recognized a hard object in the shape of a firearm inside Appellant's right pant pocket. *Id.* at 53. Sinnott alerted other officers of his finding, at which time Appellant was put on the ground and placed in custody. *Id.* Officer Steven Alexander ("Alexander") then retrieved a firearm from underneath Appellant's outer pants, in the pocket of his gym shorts. *Id.* at 55-56.

At the suppression hearing, Alexander stated he responded to the area where three men were being held after hearing a dispatch for shots fired and transmissions from Bradley and McCrady detailing their observations. (N.T. at 68-71). Prior to his arrival, while looking for the suspects himself, Alexander did not see any other groups of people who matched the description put out over the radio. *Id.* at 71. Upon arrival, within approximately five minutes of the initial call for shots fired, Alexander observed three males wearing dark clothing. *Id.* at 71-72. Because Appellant was very loud and belligerent, Alexander assisted Sinnott in detaining him.

8

*Id.* at 73. After Sinnott informed Alexander that he felt a firearm on Appellant's person, Alexander retrieved a black semiautomatic handgun from the pocket of Appellant's shorts that Appellant was wearing underneath his jeans. *Id.* at 73-75.

Appellate court cases support the finding of reasonable suspicion to stop and frisk Appellant in the present case. In *Commonwealth v. Bryant, supra,* an officer heard the firing of gunshots and saw the appellant and his companions running around the corner from where the officer heard the shots originate, while no other persons were seen running at the time. 866 A.2d at 1147. On appeal, the Superior Court, noting the encounter happened in a high crime area, stated as follows:

> Viewing the totality of the circumstances through the lense of [the officer's] experience, the combination of the aforementioned facts indicates that [the appellee] was engaged in 'unusual and suspicious conduct.' Given the facts before him at the time he heard the gunshots and saw [the appellee], [the officer] could have concluded reasonably that [the appellee] was a perpetrator, victim, or eyewitness of a possible shooting.

*Id.* Therefore, the court concluded the officer possessed sufficient reasonable suspicion to conduct a *Terry* stop. *Id.* The court also found the officer was justified in conducting a pat-down frisk for his safety due to recent gunfire in the area. *Id.*

In *Commonwealth v. Jackson, supra,* there was a radio report of an armed robbery, and the only description of the suspect was a male wearing a black baseball hat and black jacket. 678 A.2d at 799. Five minutes after receiving the report a police officer saw an individual matching that description two and one half blocks from the scene of the robbery. *Id.* at 800. Although the Superior Court noted there was a meager physical description of an alleged perpetrator wearing two common articles of clothing, the Court found the stop and frisk were justified when

considering the totality of circumstances, including the fact that the appellant fit the given description, appellant was spatially and temporally proximate to the crime scene when stopped, the crime was a serious felony, and it occurred late in the evening in a dangerous area. *Id.* at 801.

Additionally, in the case of *In re D.M.*, 727 A.2d 556 (Pa. 1999), the Pennsylvania Supreme Court found the stop and frisk of four black males was justified where an identified victim reported an armed robbery involving four or five black males, the officer observed four black males walking very quickly one-half block from the crime scene about one minute after the call, they were the only males the officer observed in the vicinity of the crime, and the group abruptly began walking in the opposite direction upon seeing the police. *Id.* at 558. In justifying the stop, the Court recognized that an officer who lacks probable cause to arrest "need not 'simply shrug his shoulders and allow a crime to occur or a criminal to escape.'" *Id.* at 557. The Court further stated the officer "would have been derelict in his duties had he not detained the group which was very possibly armed and retreating after having committed a violent armed felony mere moments earlier." *Id.* at 558.

In the case *sub judice*, Officer Bradley was patrolling in the area of East Filbert Street approaching Lafayette Street in Lancaster City when he observed three men running together north on East Filbert Street. This was in a high crime area, where there are continual problems such as fights, shootings, and weapons calls. Because hardly anyone was out that night and the ground was icy, Bradley took mental note of the three males and what they were wearing. Within one minute of seeing these individuals, Lancaster County dispatch reported a call of shots fired occurring at 25 New Dorwart Street, and gave the description of three individuals who were wearing hoodies. The call and information were provided by an identified individual.

10

According to Bradley, the three men were observed by him running in close proximity to the area where the shots were reportedly fired, less than five minutes afer the report of gunshots. The men were also wearing clothing that matched the description given by the caller. Based on the totality of these circumstances, Bradley believed the three individuals he saw were involved in the shooting. Therefore, Bradley dispatched information about his observations of the three men to other officers.

A few minutes later, Bradley was called to assist officers who had stopped three men that were wearing dark clothing. The officers made the stop based on information contained in the police dispatch and information provided by Bradley. The distance from where the shots were reportedly fired to where Appellant and the other two men were stopped was within two to three blocks of each other. Upon arrival, Bradley stated the three males who were stopped looked like the same three individuals he saw running, based on their clothing, similar height and build. Moreover, officers did not see any other groups of individuals matching the description given over the radio between the time of dispatch and the stop of Appellant and his two colleagues.

Based on this information, the trial court properly found that Bradley had specific and articulable facts, and reasonable inferences drawn from those facts in light of his experience, to suspect that the three individuals he had observed running in the street shortly before a dispatch for shots fired and who were subsequently stopped by police were the same individuals involved in the shooting. Additionally, based on the suspected criminal activity and close proximity to the area where the shots were reportedly fired, the officers had reasonable suspicion to suspect that Appellant and his two colleagues were armed and dangerous. As such, the pat-down frisk conducted of Appellant was appropriate for officer safety. Moreover, the manner in which the

11

search was performed was limited to what was necessary for the discovery of weapons that might be used to harm the officers, and the discovery of a firearm was readily apparent. Thus, the search itself was reasonable.

## CONCLUSION

Based on the foregoing, the Court did not err when it found the officers had reasonable suspicion to stop and search Appellant. Therefore, this appeal should be denied.

BY THE COURT:

_____
DONALD R. TOTARO, JUDGE

Date: ___March 17, 2016___

ATTEST:

Copies: Travis S. Anderson, Esquire, Assistant District Attorney
Diana C. Kelleher, Esquire, Assistant Public Defender

I certify this document to be filed
in the Lancaster County Office of
the Clerk of the Courts.

Jacquelyn E. Pfursich
Clerk of Courts

12